**O**

# United States District Court
# Central District of California

SCOTT ZIMMERMAN; JEFFREY HICKMAN; MARLENE GALARZA; KENNEDY PERSON, III,

               Plaintiffs,

     v.

COMCAST CORPORATION; COMCAST OF CONTRA COSTA, INC.; and DOES 1–50, inclusive,

               Defendants.

Case № 2:15-cv-08224-ODW(SSx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [16, 17, 18, 19]**

## I.   INTRODUCTION

Plaintiffs Scott Zimmerman, Jeffrey Hickman, Marlene Galarza, and Kennedy Person, III bring this action against Defendant Comcast Corporation and Comcast of Contra Costa, Inc. (collectively "Comcast") for failure to pay wages, denial of meal and rest breaks, and failure to provide accurate wage statements. The gravamen of Plaintiffs' claims is that their workload forced them to delay or forgo entirely their meal and rest breaks. Comcast now moves for summary judgment on all claims. For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART**

Comcast's Motions.  (ECF Nos. 16–19.)[1]

## II.   FACTUAL BACKGROUND

Comcast is a cable service and communications company, which employed Plaintiffs as communications technicians.  (First Am. Compl. ¶ 18, ECF No. 1-1, Ex. B; Zimmerman SUF 14; Galarza SUF 14; Hickman SUF 14; Person SUF 14.) Communications technicians work in the field, installing and repairing products at the homes and businesses of Comcast customers.  (Zimmerman SUF 57, 58; Galarza SUF 61, 62; Hickman SUF 16, 52, 53; Person SUF 17, 62, 63.)  Comcast employed Zimmerman between December 2008 and November 2012; Galarza between November 2003 and November 2012;[2] Hickman between March 2007 and June 2015; and Person between September 2008 and May 2014.  (Zimmerman SUF 14; Galarza SUF 14; Hickman SUF 14; Person SUF 14.)  All of them were based out of the same office in Santa Maria, California.  (Zimmerman SUF 16; Galarza SUF 15; Hickman SUF 15; Person SUF 16.)

### A.   Comcast's Official Policies

At all relevant times, Comcast's written policies for communications technicians provided as follows: (1) for every five hours worked, employees must take a half-hour meal break; (2) when employees worked in excess of ten hours in a workday, they may take a second half-hour meal break; (3) for every four hours worked (or major portion thereof), employees may take a ten-minute rest break. (Zimmerman SUF 1–3; Galarza SUF 1–3; Hickman SUF 1–3; Person SUF 1–3.) Employees are expected to observe and take all meal and rest breaks, are required to accurately record all time worked, are prohibited from working off the clock or on meal periods, and must record as work any breaks lasting less than twenty minutes.

---

[1] After considering the papers filed in connection with the Motions, the Court deems them appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L. R. 7-15.

[2] Galarza was employed as an Installer, a Service Technician, and a Communication Technician during this period.  (Galarza SUF 14.)  However, her claims appear limited to her work as a communications technician.  (*See generally* First Am. Compl. ¶¶ 18–26.)

(Zimmerman SUF 4, 6–9, 11; Galarza SUF 4, 6–9, 11; Hickman SUF 4, 6–9, 11; Person SUF 4, 6–9, 11.)   A supervisor cannot force an employee to work off the clock, and any employee who feels pressured to do so must immediately report this to a Human Resources representative.  (Zimmerman SUF 5, 10, 12, 13; Galarza SUF 5, 10, 12, 13; Hickman SUF 5, 10, 12, 13; Person SUF 5, 10, 12, 13.)

Plaintiffs recorded their time using an online timesheet system, although some Plaintiffs used a paper timesheet system before switching to the online system. (Zimmerman SUF 27, 28; Galarza SUF 34, 35; Hickman SUF 29; Person SUF 29.) By submitting these timesheets, the employee acknowledges that they are responsible for accurately reporting their time, verifies the accuracy of their timesheets, verifies that they timely took all breaks, and verifies that they were relieved of all duty during those breaks.  (Zimmerman SUF 28; Galarza SUF 36, 37; Hickman SUF 30, 31; Person SUF 32, 33.)   In addition, Plaintiffs had the option of "projecting" or "prepopulating" their time entries for future dates.  (Person SUF 30, 67.)  When they projected their time, they could later amend their timesheets if their actual work time differed from their projected work time.  (Person SUF 31.)

**B.   Meal and Rest Breaks**

Each Plaintiff was given a varying number of job assignments to complete throughout the day, and each assignment had a timeframe within which the technician was required to begin the job.  (*See* Zimmerman SUF 58; Galarza SUF 16; Hickman SUF 53; Person SUF 17; Person Depo. at 96–97.)  Plaintiffs were free—officially, at least—to decide for themselves when and where to take meal and rest breaks (within the confines of Comcast's written policies).  (Zimmerman SUF 17; Galarza SUF 16; Hickman SUF 16; Person SUF 17.)  Each Plaintiff knew and understood Comcast's written policies regarding meal and rest breaks, and none of them (with the possible exception of Galarza) were ever specifically told that they could not take a timely break.  (Zimmerman SUF 19, 22–25; Galarza SUF 21–33, 71–73; Hickman SUF 18, 20–24, 27; Person SUF 19, 21–26, 77, 80, 81.)  Plaintiffs would generally keep in

1   contact with their supervisor and a dispatcher throughout the day.

2       **1.   Zimmerman**

3       Zimmerman felt that his workdays were so densely packed that he often had to
4   delay or shorten his meal and rest breaks.  (Zimmerman SUF 69, 76, 81.)  Before the
5   San Jose dispatch merged with the Santa Maria dispatch, Zimmerman typically
6   received seven to nine assignments per shift; after the merger, Zimmerman received
7   an average of twelve, and as many as sixteen, assignments per shift.  (Zimmerman
8   SUF 74.)  Before the merger, Zimmerman estimates that there were twenty to thirty
9   instances where both the number and timing of assignments forced him to delay his
10  meal break past the fifth hour after his shift started.   (Zimmerman SUF 76;
11  Zimmerman Depo. at 82, ECF No. 24-9.)  In these instances, Zimmerman asked the
12  dispatcher to reassign some of his jobs to another technician so that he could take a
13  lunch break, but they were typically unable to do so.  (Zimmerman SUF 35, 77;
14  Zimmerman Depo. at 83.)  About half the time, Zimmerman would also contact his
15  supervisor to inform him of this.  (Zimmerman SUF 78; Zimmerman Depo. at 84.)

16      After the merger, the deluge of additional assignments forced Zimmerman to
17  delay or shorten his meal breaks more frequently—about once per week, or fifty times
18  in total.  (Zimmerman SUF 79, 80; Zimmerman Depo. at 84–85.)   Like before,
19  Zimmerman would contact dispatch and request that they reassign some of his jobs to
20  allow him to take a lunch break.  (Zimmerman SUF 82; Zimmerman Depo. at 86–87.)
21  However, it was "seldom" that dispatch would successfully reduce Zimmerman's
22  workload; oftentimes they would assign out one of his jobs only to then reassign him
23  another job in the same timeframe.  (Zimmerman SUF 83; Zimmerman Depo. at 87.)
24  No one directly told Zimmerman that he could not miss a timeframe in order to take a
25  lunch break, and he was never reprimanded on the occasions he did so; however,
26  Comcast would "track[] and score[]" how many timeframes technicians would miss
27  each day.  (Zimmerman SUF 84; Zimmerman Depo. at 88–89.)  Zimmerman also
28  suspected that Comcast's dispatchers punished him for missing a timeframe by

assigning him another job with a timeframe that was impossible to meet. (Zimmerman Depo. at 88–90.)  Zimmerman reported this suspicion to his supervisor, but he never heard back about it.  (*Id.* at 90–91.)

### 2.   Galarza

Like Zimmerman, Galarza testified that her job assignments forced her to delay, and on occasions forgo entirely, her meal breaks.  (Galarza SUF 77, 81.)  There were instances where she reported to her supervisor that a particular assignment was forcing her to take her lunch past the fifth hour.  (Galarza SUF 79, 85.)  If the customer could not wait for Galarza to take her meal break before finishing the job, her supervisor would instruct her to finish the assignment first before taking her meal break, because "the customers come first."  (Galarza SUF 78, 79.)  Galarza also recalled at least one occasion where she was unable to take her meal break entirely due to an extended job assignment.  (Galarza SUF 81.)  In that instance, she called her supervisor to ask for help, but was told that none was available.  (Galarza Depo. at 132–33.)

### 3.   Hickman

Hickman testified that he too was unable to take meal breaks because of his workload.  (Hickman SUF 68.)  On the occasions where he felt that an assignment was going to delay or prevent him from taking a meal break, he would contact dispatch and occasionally his supervisor.  (Hickman SUF 38, 70, 71.)  Sometimes dispatch would be able to move jobs around to enable him to take a break, but other times he was told to "just keep pushing forward and do what you can."  (Hickman SUF 70, 72; Hickman Depo. at 66.)  Sometimes he needed to skip a meal break entirely.  (Hickman SUF 73.)  On occasions, he would log out of the main computer system for a rest break only to immediately be given an assignment with a timeframe that was about to expire, which forced him to cut his break short.  (Hickman SUF 75–76; Hickman Depo. at 80–83.)  Hickman felt pressured to meet his timeframes because Comcast logged the number of times a timeframe was missed, "[a]nd if you didn't meet time frames, that made you look bad . . . .  We have to hear it from

supervisors." (Hickman SUF 74.)  Although Hickman's supervisors had emphasized to Hickman the importance of taking meal breaks, had talked to him several times after he recorded himself as having not taken a lunch break, and had never formally disciplined Hickman for missing a time frame to take a meal break, supervisors would nevertheless "stress[] [to him] the importance of making time frames." (Hickman SUF 25, 26, 40, 77.)

In addition, while Hickman was on lunch, there were occasions where he would receive calls from his supervisor during lunch breaks.  (Hickman SUF 46, 82.) Hickman informed his supervisor that he was on lunch, but his supervisor would keep talking. (Hickman Depo. at 123–24.)  While no one specifically told Hickman that he must answer a supervisor's call on his lunch break, Comcast generally required its technicians to be available to take phone calls. (*See* Hickman SUF 47; Hickman Depo. at 131–33.)

### 4. Person

Person similarly testified that he was unable to take meal breaks because of the workload.  (Person SUF 84, 92.)  While Person was instructed to take lunch breaks, he was also instructed not to miss timeframes.  (Person SUF 97.)  Person would contact dispatch or a supervisor whenever he was unable to take a timely lunch break. (Person SUF 40, 85.)  While they were often able to adjust his schedule so that he could take a break, there were about ten occasions where they could not.  (Person SUF 40, 85, 86.)  On those occasions, Person skipped his lunch break so as not to miss any timeframes.  (Person SUF 41.)  When he skipped lunch breaks, he either recorded that time as time worked, or recorded himself as taking a lunch break and then added an extra hour of time at the end of the day.  (Person SUF 42.)  Person was never disciplined for not meeting a timeframe, but his supervisors would have a "problem solving conversation" with him when he missed a timeframe.  (Person SUF 52.) Person also understood that bonuses were tied to meeting timeframes.  (Person SUF 98.)

**D.     Procedural History**

On October 22, 2014, Plaintiffs filed this action in the Santa Barbara Superior Court.  (Not. of Removal, Ex. A, ECF No. 1-1.)  Plaintiffs filed a First Amended Complaint a month later, in which they each assert the following claims: (1) failure to pay wages in violation of California Labor Code section 1194 and Industrial Welfare Commission ("IWC") Wage Order No. 4; (2) breach of implied contract; (3) failure to provide meal breaks in violation of California Labor Code sections 226.7 and 512, and IWC Wage Order No. 4; (4) failure to provide rest breaks in violation of California Labor Code sections 226.7 and 512, and IWC Wage Order No. 4; (5) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"); and (6) failure to provide accurate wage statements in violation of California Labor Code section 226.  (*Id.*, Ex. B.)  On October 20, 2015, Comcast removed the action to federal court based on diversity jurisdiction.  (ECF No. 1.)  On June 27, 2016, Comcast moved for summary judgment on Plaintiffs' claims.  (ECF Nos. 16–19.)  Those motions are now before the Court for consideration.

### III.     LEGAL STANDARD

Summary judgment should be granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine dispute for trial.  *Id.*; Fed. R. Civ. P. 56(c).

A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).  Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and

defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV.  EVIDENTIARY OBJECTIONS

### A.  Comcast's Objections

In support of their oppositions, Plaintiffs submit transcripts from five depositions, four of which were taken in other cases. (Glugoski Decl., Exs. L, M, N, O, R, ECF No. 24.) However, each transcript (save for one) is missing an executed court reporter's signature page. (*Id.*) Comcast argues that this renders the transcripts inadmissible. (*See* ECF Nos. 26-1, 27-1, 28-1, 29-1.) The Court agrees. "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002). Here, one transcript has no signature page attached, and the signature page on three others is not executed (which is the equivalent of no signature page). *See id.* (citing *Pavone v. Citicorp Credit Servs., Inc.*, 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997), *aff'd*, 172 F.3d 876 (9th Cir. 1999) (unpublished), for the proposition that an unsigned reporter's signature page renders the deposition transcript inadmissible). It is "well settled that unauthenticated documents cannot be considered on a motion for summary judgment," *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987), and thus the Court sustains Comcast's objection to the deposition transcripts of Garfield Woods, Jannine Hemphill, Jason Moore, and Kevin Jay Perry. However,

Fred Walkover's transcript is accompanied by an executed signature page and is therefore admissible.

**B.      Plaintiffs' Objections**

Plaintiffs submit numerous objections to the declaration of Jason Moore, who is a supervisor employed by Comcast.  Plaintiffs generally object to Moore's description of Comcast's meal and rest break policies and timekeeping system on the grounds that the testimony lacks foundation, Fed. R. Evid. 602, and constitutes hearsay, Fed. R. Evid. 802.  The gist of Plaintiffs' objections appears to be that Moore has not established that these exact policies and this exact time-keeping system were in place for the entire time that Plaintiffs were working at Comcast.  The Court disagrees with Plaintiffs' objections.  Based on Moore's employment at Comcast, he is clearly competent to testify as to Comcast's policies regarding meal and rest breaks and about Comcast's timekeeping system.  That the policies or the system may not have been in place during the entirety of Plaintiffs' employment is at best a question of relevance; however, Plaintiffs do not object based on relevance.  Thus, Plaintiffs' objections are overruled.[3]

## V.      DISCUSSION

**A.      First and Second Claims: Failure to Pay Wages[4]**

Liability for off-the-clock work claims "is contingent on proof [that the employer] knew or should have known off-the-clock work was occurring." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1051 (2012); *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 585 (2000); *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1083 (N.D. Cal. 2007) ("To prevail on his off-the-clock claim, [plaintiff] must prove that [the employer] had actual or constructive knowledge of his alleged off-the-

---

[3] Plaintiffs also object to certain deposition testimony from each Plaintiff.  The Court finds it unnecessary to discuss in detail every objection, suffice it to say the Court has reviewed and overrules each one.

[4] Both parties treat the first and second causes of action as functionally equivalent, and thus so does the Court.  Any argument that there is a material difference between the two is waived.

clock work.").   "[T]hat employees are clocked out creates a presumption they are doing no work, a presumption [the plaintiffs] have the burden to rebut."   *Brinker Rest. Corp.*, 53 Cal. 4th at 1051.

### 1.   Zimmerman

Comcast argues that Zimmerman properly recorded all time worked and was paid for all time recorded.  (Zimmerman Mot. at 8, ECF No. 18-3.)  Plaintiffs provide no argument in response, but nonetheless dispute the facts supporting Comcast's position by pointing out: (1) that Zimmerman testified that he was paid for all of the time he recorded only "as far as [he] can recall"; and (2) that he recorded himself taking a rest break when in fact he did not.  (Zimmerman Stmt. of Genuine Disputes 31, 34.)   As to the first issue, Plaintiffs' insinuation that there *may* have been an instance (that Zimmerman does not recall) where he was not paid for all time worked plainly does not created a genuine factual dispute.  The second issue does not create a genuine factual dispute either.  Zimmerman conceded in deposition that if he recorded himself as taking a rest break, there would be no way for Comcast to know that he did not actually take a break.  (Zimmerman Depo. at 103.)  This is fatal to his off-the-clock work claim.  *Brinker Rest. Corp.*, 53 Cal. 4th at 1051; *Morillion*, 22 Cal. 4th at 585.   Thus, the Court grants summary judgment on Zimmerman's first and second claims for failure to pay wages.

### 2.   Galarza

Comcast similarly argues that Galarza properly recorded all time worked and was paid for all time recorded.  (Galarza Mot. at 7, ECF No. 19-3.)  In response, Plaintiffs argue (1) that Comcast should never rely on projected time submitted by the employee, and (2) that Comcast had another, more accurate system with which they could verify the time worked by each employee, and should have used that system to cross-check each employee's time submissions.  (Galarza Opp'n at 3–4, ECF No. 20.) The Court is not convinced by either argument.

Plaintiffs do not show either that Comcast's practice of having employees

project their time systematically causes inaccurate timekeeping, or that it caused Galarza in particular to not to be paid for time she actually worked.   Comcast employees are given the opportunity to change their projected time if it turns out that they worked more or fewer hours than they originally projected, and Plaintiffs submit no evidence showing that employees either did not know they could change their time or were in any way discouraged from changing their time if needed.   Indeed, Galarza herself submitted changes to her projected time.   (Galarza Decl., Ex. A. at COM/ZIM002814.)   In short, Plaintiffs' speculation that Comcast's timekeeping system *could* result in inaccurate timekeeping does not mean that it actually *did* cause inaccurate timekeeping.

Moreover, Plaintiffs do not cite any authority showing that Comcast has an affirmative duty to comb through every employee's recorded time and compare it to some other system they have that may or may not be able to track employee hours.   As a threshold matter, the Court is not satisfied that this alternate system is actually "more accurate" than the employee's own timekeeping.   For example, if Plaintiffs are forced to take a work call during their breaks (which several Plaintiffs testified that they were), it does not appear that this alternate system would recognize this as worked time.   More significantly, though, Plaintiffs produce no evidence showing that Galarza was somehow prevented from recording her hours accurately, and thus there is no reason why such an elaborate cross-check system—which would eat up a significant amount of a supervisor's time—is necessary.

In sum, Plaintiffs do not submit admissible evidence showing that Galarza was not compensated for time worked.   Summary judgment on her first two claims is thus also proper.

### 3.   Hickman

Comcast argues that although Hickman claims he performed off the clock work, Comcast had no reason to know this, and is therefore not liable.   (Hickman Mot. at 8–10, ECF No. 17-3.)   Plaintiffs respond using the same arguments they did with respect

to Galarza.  (Hickman Opp'n at 3–4, ECF No. 21.)  For the reasons already discussed, the Court concludes that those reasons do not create a disputed issue of fact with respect to off-the-clock work.  However, for the reasons discussed *infra*, to the extent Hickman's off-the-clock work claim is derivative of his denial of meal and rest break claim, the Court concludes that a reasonable factfinder could find that Comcast should have known that he was working off the clock.  Hickman testified that he would contact a supervisor or the dispatcher and inform them that he would be unable to take a proper meal break if jobs were not reassigned.  On the occasions where the job was not reassigned, Hickman did not take a full meal break but nevertheless recorded taking a full meal break, because he did not want to either miss a timeframe or get in trouble for not taking a full break.  (Hickman SUF 34, 57.)  In those situations, a reasonable factfinder could conclude that Comcast should have known that Hickman did not in fact take a full meal break.  Thus, the Court grants summary judgment, but only to the extent the off-the-work claims are *not* derivative of the denial of meal break claims.

### 4.      Person

Comcast also argues that it did not have any reason to know of any off the clock work Person may have performed.  (Person Mot. at 9–11, ECF No. 16-3.)   Plaintiffs again respond with the same arguments that they did with respect to Galarza and Hickman, which the Court does not find convincing for the reasons already stated.  (Person Opp'n at 3–5, ECF No. 22.)

Plaintiffs also point to a timesheet that Person filled out by hand that does not reflect any afternoon rest break being taken for one week.  (*Id.* at 4.)  This is also insufficient to create a factual dispute.  All the timesheet shows is that Person did not *record* himself as taking an afternoon break for one week.  When asked in deposition whether or not he actually took an afternoon rest break that week, he testified only that he did not *recall* if he took one or not; he did not affirmatively testify that he did not.  (Person Depo. at 153.)  Thus, summary judgment on Person's off-the-clock claims is

1    appropriate.

2    **B.    Third and Fourth Claims: Denial of Meal and Rest Breaks**

3      **1.    Excessive Workload**

4      Comcast argues that Plaintiffs knew its written policies permitted—indeed,

5    required—them to take at least a 30-minute meal break before the fifth hour of work,[5]

6    that Plaintiffs were never instructed to delay or not take a meal break, and were never

7    reprimanded for missing a timeframe to take a meal break.  Rather, Comcast argues,

8    Plaintiffs simply chose not to take timely meal breaks for various other reasons—e.g.,

9    not wanting to work overtime, wanting to be done with a particular assignment

10   sooner, or just a plain misunderstanding of what Comcast required of them.  And

11   because an employer need not force its employees to take breaks, Comcast contends

12   there is no liability here.  Plaintiffs respond that their workloads made it difficult or

13   impossible to take their breaks, that their supervisors knew that to be the case, and that

14   they were either pressured or given incentives to delay or forgo breaks.  The Court

15   concludes that Plaintiffs have raised a genuine factual dispute as to whether Comcast

16   permitted its employees to take breaks.

17     "An employer may not employ an employee for a work period of more than

18   five hours per day without providing the employee with a meal period of not less than

19   30 minutes."  Cal. Lab. Code § 512; *see also* Cal. Code Regs. tit. 8, § 11040(11)(A)

20   ("No employer shall employ any person for a work period of more than five (5) hours

21   without a meal period of not less than 30 minutes.").  Similarly, "[e]mployees are

22   entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20

23

24     [5] Plaintiffs make much of the fact that there were supposedly several different meal and rest
     break policies in effect throughout the Plaintiffs' employments with Comcast.  Plaintiffs point to a
25   prior policy that instructs technicians to take their meal break in "approximately the middle of the
     day," and argue that this language created "confusion" about whether or not they were allowed to
26   take meal breaks before the fifth hour of work.  However, this purported confusion is hardly
     material.  All of the policies state that technicians must take a meal break for every five hours
27   worked; an additional instruction that the break be taken "approximately the middle of the day" is
     perfectly consistent with, and does not undermine, that admonition.
28

minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Brinker Rest. Corp.*, 53 Cal. 4th at 1029; *see also* Cal. Code Regs. tit. 8, § 11040(12)(A) ("Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.").   In 2012, the California Supreme Court held that an employer "satisfies [its] obligation [to provide breaks] if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so."   *Brinker Rest. Corp.*, 53 Cal. 4th at 1040.  "[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed.  Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations, and work by a relieved employee during a meal break does not thereby place the employer in violation of its obligations and create liability . . . ." *Id.* at 1040–41.

That said, "[a]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks."  *Id.* at 1040 (citing *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962–63 (2005)); *see also Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1304–05 (2010); *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 638 (S.D. Cal. 2010)).  "The wage orders and governing statute do not countenance an employer's exerting coercion against the taking of, creating incentives to forgo, or otherwise encouraging the skipping of legally protected breaks."  *Brinker Rest. Corp.*, 53 Cal. 4th at 1040; *see also Dilts*, 267 F.R.D. at 638 ("An illusory meal period, where the employer effectively prevents an employee from having an uninterrupted meal period, does not satisfy this requirement.").

Reading the evidence in the light most favorable to Plaintiffs, a reasonable

factfinder could conclude that Comcast "exert[ed] coercion against the taking of, creat[ed] incentives to forgo, or otherwise encourag[ed] the skipping of legally protected breaks." *Brinker Rest. Corp.*, 53 Cal. 4th at 1040.  Each Plaintiff testified that there were several occasions where they could not take an uninterrupted 30-minute meal break within five hours of the start of their shift either because they were in the middle of a job, or because they were assigned jobs with imminently expiring timeframes.  (Zimmerman SUF 80, 81; Zimmerman Depo. at 82–85; Galarza SUF 77, 81; Hickman SUF 68; Person SUF 84.)  Each Plaintiff testified that they would call the dispatcher or their supervisor (or both) and request assistance in order to take a lunch break, but that the dispatcher would often be unable to reassign jobs to other technicians.  (Zimmerman SUF 82, 83; Zimmerman Depo. at 82–90; Galarza SUF 79, 81; Galarza Depo. at 132–33; Hickman SUF 70, 71; Hickman Depo. at 66; Person SUF 40, 85.)[6]  Galarza was specifically instructed to delay her meal break in order to finish the assignment, because "the customers come first" (Galarza SUF 78, 79; Galarza Depo. at 138); Hickman was similarly instructed to "just keep pushing forward and do what you can" (Hickman SUF 70; Hickman Depo. at 66).  Each Plaintiff also knew of the premium Comcast placed on meeting timeframes, knew that it was frowned upon to miss a timeframe, and knew that bonuses were tied to making timeframes.  (Zimmerman SUF 84 (Comcast would "track[] and score[]" how many timeframes technicians would miss each day); Hickman SUF 74 (Comcast logged the number of times a timeframe was missed, "[a]nd if you didn't meet time frames, that made you look bad . . . .  We have to hear it from supervisors"); Hickman SUF 77 (Hickman's supervisors would "stress[] the importance of making time frames"); Person SUF 98 (bonuses were tied to meeting timeframes).)[7]

---

[6] Hickman testified that this caused him to skip rest breaks as well.  He would log out for a rest break only to be given an assignment with a timeframe that was about to expire, which forced him to cut his break short.  (Hickman SUF 75–76; Hickman Depo. at 80–83.)

[7] The Court disagrees with Comcast's arguments that this testimony is simply "uncorroborated and self-serving testimony" that does not create a genuine issue of fact, *see, e.g.*, *Villiarimo v. Aloha*

The factors that Comcast points to—e.g., that none of the Plaintiffs were officially disciplined for missing timeframes in order to take meal breaks,[8] that each time they signed their timesheets they certified that they took legally-compliant breaks,[9] and that at least Zimmerman and Person were never specifically instructed by a supervisor not to take a meal break[10]—certainly support an inference of nonliability, but are not dispositive. Indeed, *Brinker* specifically recognized that an employer can undermine an officially compliant break policy by pressuring or incentivizing employees to delay or forgo such breaks. 53 Cal. 4th at 1040. Tying bonuses to meeting timeframes, for example, is a powerful incentive to skip breaks if that is the only way to meet a timeframe. Similarly, a statement signed by an employee confirming that they took legally-compliant meal breaks means little when their paycheck is conditioned on their signing that statement, for it would be a rare instance where a non-exempt employee would be willing to delay their income to push the issue of meal breaks with their employer. And, of course, an employer does not *ipso facto* comply with meal break requirements just because a supervisor did not explicitly instruct an employee not to take their meal break. For these reasons, the Court concludes that there is a genuine dispute as to whether Comcast provided their employees with legally-compliant meal breaks.

### 2.    Interrupted Breaks

Plaintiffs also allege that they were unable to take a uninterrupted breaks because they were required to field calls from either dispatchers or supervisors. Zimmerman testified that there were instances where dispatch would contact him during his meal break, though he knew there was no requirement that he immediately

---

*Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002), because each Plaintiff's testimony generally corroborates the other's testimony.

[8] Zimmerman SUF 38; Galarza SUF 55; Hickman SUF 40; Person SUF 52.
[9] Zimmerman SUF 28; Galarza SUF 36, 37; Hickman SUF 30, 31; Person SUF 32, 33.
[10] Zimmerman SUF 39; Person SUF 55.

respond.  (Zimmerman Depo. at 95–96.)  Galarza testified that she received calls from supervisors during her breaks, but knew that she did not have to pick up the call during her lunch break, and was never disciplined for not doing so.  (Galarza Depo. at 149–55.)  Hickman testified that he received phone calls from supervisors during breaks, who continued talking after he told them that he was on a break.  (Hickman Depo. at 122–23.)  However, Hickman also testified that he was never told that he must answer his phone during his breaks, and was never disciplined for not answering his phone on his breaks.  (*Id.* at 132–33.)  Finally, Person testified that it was "understood" that a technician should always pick up calls from supervisors or dispatch, even on their lunch break.  (Person Depo. at 69–70.) This understanding was based on his observing senior technicians doing so while he was a junior technician, on supervisors questioning him for not answering his phone, and on the fact that the calls would generally concern a time-sensitive issue.  (Person Depo. at 139–40, 144.) However, Person was never specifically told by a supervisor that he must pick up his phone on break, and was never disciplined for not picking up his phone during his breaks.  (Person SUF 57.)

Based on this evidence, no reasonable factfinder could conclude that Plaintiffs were not relieved of duty during their breaks as a result of receiving phone calls from supervisors, dispatchers, or other employees.   Each Plaintiff acknowledged that they were never instructed to answer their phones during the lunch period, and were never disciplined for not doing so.[11]  Thus, the Court grants summary judgment to the extent it based on Plaintiffs receiving phone calls from supervisors during their meal periods.

### 3.    Second Meal Break

Plaintiffs argue that they were not informed of their right to take a second

---

[11] Person provides some evidence tending to show that Comcast insisted that technicians answer their phones during business hours.  However, the Court finds that this does not create a triable issue of fact, for there is no evidence (besides Person's own conjecture) that Comcast required them to immediately answer their phones *on their breaks*.

thirty-minute meal break after they switched to working 10-hour days.  However, it is undisputed that Comcast's policy provides for a second meal break for shifts in excess of ten hours, and that each Plaintiff read the policy and signed an acknowledgement that they would comply with the policy.  (Zimmerman SUF 2, 4, 21, 22; Galarza SUF 2  4, 21, 22, 28; Hickman SUF 2, 4, 20, 21, 23; Person SUF 21.)[12]  Thus, Plaintiffs' assertion that Comcast did not inform them of their right to a second meal break rings hallow.

**C.    Fifth Claim: Violation of UCL and Waiting Time Penalties**

    **1.    UCL**

Both Comcast and Plaintiffs agree that Plaintiffs' UCL claims are derivative of their meal and rest break claims, and thus should stand or fall with those claims. *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 244 (2007) (dismissing Labor Code claims and thus also dismissing "[t]he derivative claim of liability under Business and Professions Code section 17200"); *Cleveland v. Groceryworks.com, LLC*, No. 14-CV-00231-JCS, 2016 WL 4140504, at *24 (N.D. Cal. Aug. 4, 2016) ("[L]iability under the UCL is generally derivative of liability under another statutory violation."); *Rubin v. Wal-Mart Stores, Inc.*, 599 F. Supp. 2d 1176, 1179 (N.D. Cal. 2009) (dismissing UCL claim that was derivative of deficient overtime wage claims under the Labor Code); *Porch v. Masterfoods, USA, Inc.*, 685 F. Supp. 2d 1058, 1076 (C.D. Cal. 2008) (same), *aff'd*, 364 F. App'x 365 (9th Cir. 2010).  Because the Court does not grant summary judgment on the meal and rest break claims, it thus denies summary judgment on the UCL claims.

    **2.    Waiting Time Penalties**

Similarly, both Comcast and Plaintiffs agree that Plaintiffs' request for an award of waiting time penalties are derivative of their meal and rest break claims, and thus should stand or fall with those claims.  The Court, however, concludes that

---

[12] In fact, Person knew that he was entitled to a second thirty-minute meal break if he worked over ten hours, and waived that meal period so that he could leave work earlier.  (Person SUF 23.)

Plaintiffs' request for waiting time penalties fails despite not granting summary judgment on the meal and rest break claims.

"If an employer willfully fails to pay, without abatement or reduction . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Lab. Code § 203(a). "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due." Cal. Code Regs. tit. 8, § 13520; *see also Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008). "However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." § 13520.

> A "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a "good faith dispute."

*Id.* Here, there are several facts that are largely undisputed by Plaintiffs with respect to the meal and rest break claims that support an inference of non-liability. The Court is thus satisfied that Comcast's failure to pay wages was not "willful," and thus grants summary judgment on the request for waiting time penalties.

**D.    Sixth Claim: Accurate Wage Statements**

**1.    Zimmerman and Galarza**

Comcast argues that Zimmerman's claim and Galarza's claim for inaccurate wage statements are barred by the statute of limitations. (Zimmerman Mot. at 13–15; Galarza Mot. at 13–15.) The statute of limitations on an action to recover a penalty is one year. Cal. Code Civ. Proc. § 340(a); *see also Murphy v. Kenneth Cole Prods.,*

*Inc.*, 40 Cal. 4th 1094, 1118 n.16 (2007) (noting that a "claim for itemized wage statement violations . . . [is] undisputedly governed by a one-year statute of limitations").   California Labor Code section 226(e) characterizes the damages recoverable for inaccurate wage statements as a "penalty."   Cal. Labor Code § 226(e)(1); *see also Murphy*, 40 Cal. 4th at 1108 ("In section 226, the Legislature imposed a penalty on employers who fail to provide itemized wage statements that comply with the Labor Code."); *A-Ju Tours, Inc. v. Ok Song Chang*, No. B230858, 2013 WL 4562308, at *8 (Cal. Ct. App. Aug. 28, 2013) ("We therefore conclude that an award under Labor Code section 226, subdivision (e) in excess of actual damages constitutes a penalty, so a one-year limitations period applies under Code of Civil Procedure section 340, subdivision (a)."). Here, both Zimmerman and Galarza ended their employment with Comcast in November 2012, which was more than one year before they filed this action.   Moreover, Plaintiffs do not provide any evidence or make any argument that their claims for inaccurate wage statement penalties are subject to equitable tolling.   *See In re Marriage of Zimmerman*, 183 Cal. App. 4th 900, 912 (2010) (plaintiff bears the burden of proving equitable tolling).   Accordingly, those claims are barred by the statute of limitations, and thus summary judgment is appropriate.

### 2. **Hickman and Person**

In their First Amended Complaint, Plaintiffs allege that Comcast: (1) failed to provide Plaintiffs with an itemized statement showing gross wages earned, total hours worked, and the applicable hourly rates along with the number of hours worked at each rate; and (2) destroyed certain data showing when Plaintiffs logged in and out for the purposes of meal periods, and thus "failed to maintain records" as required under the Labor Code. (First Am. Compl. ¶¶ 71–73.)  As to the first theory, Comcast argues that the wage statements of Hickman and Person comply with all applicable requirements.  (Hickamn SUF 48; Person SUF 58.)  Moreover, to the extent this claim is derivative of Plaintiffs' off-the-clock claims (i.e., because they worked more hours

than they recorded, their wage statements were necessarily inaccurate), Comcast argues that there is no liability because Hickman did not perform any off the clock work with Comcast's knowledge.  As to the second theory, Comcast argues that even if the data to which Plaintiffs refer does constitute a "record," there is no evidence that Comcast destroyed it.  In response, Plaintiffs simply state that this claim is wholly derivative of their claims for unpaid wages and denial of meal and rest breaks, and thus that this claim stands or falls based on those other claims.

The Court agrees that there is no evidence of any destruction of data, and thus grants summary judgment on this theory of liability.  Moreover, because the Court concludes that because Person's off-the-clock claims fail, this claim also fails to the extent they are derivative of those claims.  However, because the Court has concluded that Hickman may proceed with his claim for off the clock work and denial of meal and rest breaks, the Court denies summary judgment to the extent that Hickman's wage statement claim is derivative of his other claims.  *See Novoa v. Charter Commc'ns, LLC*, 100 F. Supp. 3d 1013, 1025 (E.D. Cal. 2015).

## VI.   CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Comcast's Motions.  (ECF Nos. 16–19.)  The Court grants summary judgment on:

(1)    Each Plaintiff's first and second causes of action, <u>except</u> Hickman's claims to the extent that they are derivative of his denial of meal and rest break claims;

(2)    Each Plaintiff's third and fourth causes of action to the extent those claims are based on receiving telephone calls during their breaks, or not being informed of their right to a second meal break;

(3)    Each Plaintiff's claim for waiting time penalties;

(4)    Each Plaintiff's fifth cause of action under the UCL to the extent that the claim is derivative of the claims for denial of meal and rest break periods on which the Court granted summary judgment;

(5)    Each Plaintiff's sixth cause of action for inaccurate wage statements, except Hickman's claims to the extent that they are derivative of his denial of meal and rest break claims.

Finally, the Court wishes to express its dismay with the grossly excessive briefing on these Motions.  Comcast filed four separate motions for each Plaintiff, resulting in almost 400 purportedly undisputed material facts, 180 pages of briefing, and 100 pages of objections.  While there were some variations in each Plaintiff's specific situation, many of the facts and much of the briefing for each motion were identical, and still many more facts were hardly material.  Short and concise submissions are far more useful than long and repetitive ones; the parties should bear this in mind when preparing their pretrial documents.  In particular, the parties should prepare only one set of pretrial documents for all Plaintiffs.

**IT IS SO ORDERED.**

November 22, 2016

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**